## Case No. 15,377.

UNITED STATES v. HOLLAND (two cases).

[3 Cranch, C. C. 254.] [1]

Circuit Court, District of Columbia. Dec. Term, 1827.

LARCENY — JOINT AND SEVERAL INDICTMENTS — EVIDENCE.

If two be separately indicted for the same theft, and one be convicted, it is necessary for the United States, upon the trial of the other, to prove that it was a joint theft, and that both were present at the act of taking the goods; but it is not necessary to charge in the indictment that the theft was joint; they may be indicted jointly or severally, as both are principals; if there be a doubt as to one whether he were present, he must be acquitted upon an indictment charging him as principal.

Negroes Margarett Holland and her daughter, Louisa Holland, were indicted separately for the same theft. Neither of the indictments mentioned the participation of the other in the crime. The jury first found Margarett, the mother, guilty. Afterwards, upon the trial of Louisa, Mr. Wallach, for the prisoner, prayed the court to instruct the jury that they could not find her guilty, unless they should be satisfied, by the evidence, that it was a joint theft, and that both were present at the act of taking the goods.

[1] [Reported by Hon. William Cranch, Chief Judge.]

---

## Case No. 15,378.

UNITED STATES v. HOLLAND.

[2 N. Y. Leg. Obs. 55.]

Circuit Court, S. D. New York. 1843.

GRAND LARCENY ON THE HIGH SEAS — TAKING SHIP'S PROVISIONS—QUESTION FOR JURY—VERDICT.

1. Where a prisoner was indicted for a larceny on shipboard on the high seas, on a voyage from the port of Liverpool to the port of New-York, for taking the ship's provisions, and disposing of them to the steerage passengers:—It was *held*, that the indictment was sustainable under the act of congress passed April 30, 1790, § 16 [1 Stat. 116].

2. Although the steward of the vessel had charge of the provisions for the voyage, yet when he acted in the capacity of cook and steward for the vessel, and disposed of the provisions to the steerage passengers, it was a question of fact for the jury to determine whether the taking of the property originally was felonious.

3. When the jury found the prisoner guilty, under the act of congress above mentioned, they should assess in the verdict for the value of the property taken.

The prisoner was indicted by the grand jury of the Southern district of New-York for a grand larceny committed on board of the American ship Mary Howard, on the high seas, on a voyage from Liverpool to the port of New-York. The indictment was founded upon the act of congress passed April 30, 1790 (section 16), which, among other things, declares: "That if any person upon the high seas, shall take and carry away with an intent to steal or purloin the personal goods of another, such person so offending, his counsellors, aiders and abettors, knowing of, and privy to the offences aforesaid, shall, on conviction, be fined not exceeding the four-fold value of the property so sold, embezzled or purloined, the one moiety to be paid to the owner of the goods, and the other moiety to the informer and prosecutor, and be publicly whipped not exceeding thirty-nine stripes." The whipping has been abolished by a subsequent act of congress. The indictment alleged that the prisoner on said voyage on board of said vessel, did take and carry away with intent to purloin and steal the same, fifty pounds of meat and fifty pounds of bread, the personal property of the owners of said vessel,

The prisoner, upon being arraigned, pleaded not guilty.

On the trial the principal witness introduced on the part of the United States was Samuel Ware, the master of the vessel, on said voyage. He testified that the vessel was an American vessel. and that the prisoner was the cook of the vessel for the voyage: that the prisoner shipped at New-York, went the voyage to Liverpool and returned on the homeward voyage to New-York; that his vessel on the homeward voyage brought out something near 200 steerage passengers, who occupied the steerage of the ship; that his crew were some 12 or 14 in number; that on the homeward voyage, the prisoner's duty was to cook the provisions for the crew and officers of the vessel; that he might cook also for the steerage passengers at the galley, they finding their own provisions; that he took pay for cooking, but that it was against the rules of the ship. strictly speaking, for the cook to do any other cooking than what was required for the officers and crew; that it was somewhat of a privilege or perquisite for the cook to do any cooking for the steerage passengers; that in no case was it the privilege or right of the cook to supply any of the passengers with provisions of any kind; that steerage passengers furnished themselves with their own food and provisions for the voyage; that these were the terms upon which all of the steerage passengers were taken on board of vessels, carrying steerage passengers across the Atlantic: that he knew of no exception; it was the general usage of trade. The witness also testified that in the first place the steward of the ship dealt out the provisions every day to the cook, to prepare them for the crew and officers of the vessel by cooking, and that he had no right to take any other provisions than such as were designated by the steward. It also appeared that the prisoner acted both as steward and cook, during a considerable portion of the homeward voyage: that on the outward voyage to Liverpool. no steerage passengers were carried out; that a certain number of pounds of meat and bread were dealt out to the cook daily, which were abundantly sufficient for the crew and officers of the vessel; that they had the same number of officers and crew coming home to New-York that they had when the vessel was on the outward voyage to Liverpool; that on the outward voyage the crew were satisfied with their provisions; they had abundance; that on the homeward voyage. the crew were continually complaining that the food was short in quantity. while the witness found that full two barrels more of beef were exhausted in the same time on the homeward voyage than when she was on the outward voyage; that the bread was also continually running short. and the witness found that his beef and bread became almost exhausted before

he got in, when he had put up a very large supply for the voyage. The witness, to a question put to him, stated that he never had seen the cook give any provisions to the steerage passengers, but he was satisfied that it had been done, as some of the hands had complained to him that such was the case, and the witness stated that he had no doubt he had lost from $50 to $100 worth on the voyage. and perhaps more. He had charged the cook with purloining the provisions, but got no satisfactory answer. It was proved by several witnesses, that they had seen the prisoner take the bread of the ship and sell it to the steerage passengers. They had also seen him boil meat for the officers and crew of the vessel, and that pieces of it had been sent below by the prisoner. On one occasion they saw the prisoner, while cooking for the ship, take a piece of meat out of the pot at the galley and wrap it up in a cloth and give it to a person who came on deck for it, and then it was carried below among the steerage passengers. Other acts of the prisoner were proved. such as that he had taken money from the steerage passengers for provisions; indeed there could be but little doubt but that the prisoner had purloined or disposed of more or less of the ship's provisions from the galley to the steerage passengers of the voyage. How much, it did not distinctly appear. The prisoner introduced no evidence direct for his defence; but he endeavored to show by cross-examination of the witnesses against him, that he had a privilege of cooking on the voyage for the steerage passengers. and that it was known to the master and officers of the vessel.

The case being closed, the prisoner's counsel submitted to the court the following propositions. and asked the court to instruct the jury that under the evidence as it appeared, the prisoner could not be convicted of the offence charged in the indictment:

(1) That the prisoner being both cook and steward of the vessel on the homeward voyage. he had the custody of the provisions of the vessel. and therefore he could not be convicted of a larceny as charged in the indictment; that to make out the crime of larceny. it must appear that there was an intent of stealing the property when it first came to the hands of the offender. and at the very time of his first receiving it. 3 Chit. Com. Law. p. 920; 3 Inst. 107. The case was similar. said the learned counsel, to that of a man intending to go a distant journey, hiring a horse fairly and bona fide for that purpose. and evidences the truth of such intention by actually proceeding on the way. but afterwards rides off with the horse. That no theft would be committed because the felonious design was imagined subsequent to the delivery. which was obtained without fraud or design. 1 Hale, P. C. 504; 1 Hawk. P. C. c. 33, § 2; 2 East, P. C. 694. In the present case the property had

been delivered to the prisoner upon trust. and although he had converted it. such conversion did not amount to larceny. Archb. Cr. Pl. 186.

The learned counsel also urged that the present case was properly one of embezzlement, and not of larceny, under the act; and as the prisoner had been indicted for one offence, and if found guilty, had been shown to have committed another offence not named in the indictment in the act of congress. he ought to be acquitted. The act was technical, and used the terms of taking and carrying away; whereas an embezzlement was properly neither, but was only a species of larceny, applicable to cases of servants coming into possession of property by virtue of their employment, and afterwards converting the same to their own use. 2 Rev. St. N. Y. p. 678. § 59.

The district attorney, contra, submitted that there had evidently been a series of depredations by the prisoner upon the property that belonged to the owner, and that every successive depredation might be used as an argument against the prisoner, that he had taken the property, or some portion of it. with a felonious intention. The intent might reasonably be inferred as to the excess of the provisions used by the cook over and above what was necessary on the voyage; the difference between the outer voyage and the homeward voyage in the quantity of the provisions was very great, and upon this difference in quantity it was that the jury ought to infer a felonious intention; the learned counsel requested the court to charge the jury. that the prisoner was guilty of the offence charged in the indictment. if they believed the testimony brought against him.

BETTS, District Judge (charging jury). 1. That in order to constitute a larceny there must be a taking of the goods either actual or constructive; that an actual taking of the goods was where the owner retained possession and the goods were taken against his will, or without his consent; that where there is a constructive taking the owner may in fact deliver the goods to another. but in law he is deemed to retain possession of them: that a taking from the constructive possession of the owner in the present case was sufficient, and it became a mere question of fact for the jury to determine. whether the goods had been obtained by the prisoner with a felonious intent; that if they believed the prisoner had intended to make away with the provisions of the vessel when he received them for cooking. that in such a case it was larceny for all the goods he had disposed of; that if the jury believed that he had taken possession of the provisions in the first instance fairly and without a felonious intent. they ought to acquit the prisoner under the indictment; and if they found him guilty, they were to assess

the value of the property taken. Whereupon the jury retired, and came into court, and said they found the prisoner guilty in name and form charged in the indictment, and they assessed the value of the property taken to $10.

The prisoner was brought up for sentence; the court imposed a fine of $40 upon the prisoner, who was to stand committed until the sum was paid, not exceeding a term of six months' imprisonment in the county jail.